# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF Niagara

--------------------------------------------------------------

Timothy Eckert

--------------------------------------------------------------

(Names of Plaintiff(s)/Petitioner(s)

VS

Michael Paul, William Nelson, Augustus Batcho, Chad Lasher,

Cory Lasher, Carmelo Arroyo, Louis Malone

--------------------------------------------------------------

(Names of Defendant(s)/Respondent(s)

--------------------------------------------------------------

**ORIGINAL FILED**

**OCT 2 5 2024**

JOSEPH A. JASTRZEMSKI
NIAGARA COUNTY CLERK

SUMMONS

**185074/2024**
10/25/2024  02:11:31 PM
Receipt # 2024662606
2 Pages

Joseph A. Jastrzemski, Niagara County Clerk          Clerk: LMK

To the Person(s) Named as Defendant(s) Above:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: October 24 _____. 20 24
(Date of Summons)

Timothy Eckert
(Plaintiff(s) name - person bringing on lawsuit)
7571 Fairview Drive
(Plaintiff(s) street address)
Lockport, New York 14094
(Plaintiff(s) city, state, zip)
7165660767
(Plaintiff(s) telephone no.)

See Page 2
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

Venue:    Plaintiff(s) designate(s) Niagara _____ County as the place of trial. The basis of this designation is: (Enter County above; then select one category below, listing specific County)

        ☒    Plaintiff(s)' Residence in Niagara _____ County.
        ☐    Defendant(s)' Residence in _____ County.
        ☐    Other -- Describe: _____.

**NOTE: THIS FORM OF SUMMONS MUST BE SERVED WITH A COMPLAINT**

**EXHIBIT A**

Defendants

_Michael Paul
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_William Nelson
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Augustus Batcho
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Chad Lasher
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Cory Lasher
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Louis Malone
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Carmello Arroyo
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NIAGARA

ORIGINAL FILED

OCT 2 5 2024

JOSEPH A. JASTRZEMSKI
NIAGARA COUNTY CLERK

Timothy Eckert,

      Plaintiff,

  vs.

Michael Paul, Augustus Batcho, Chad Lasher,
Cory Lasher, William Nelson, Louis Malone,
Carmello Arroyo, John Doe1, John Doe2, John
Doe3, John Doe4

      Defendants

)
)
)
)
)
)
)
)
)
)

Case No.:

Complaint

COMPLAINT

**185074/2024**
10/25/2024 02:11:31 PM
Receipt # 2024662606
17 Pages
Joseph A. Jastrzemski, Niagara County Clerk          Clerk: LMK

Dated this 23rd day of October, 2024

7571 Fairview Dr.
Lockport, NY 14094
Pro Se :Timothy Eckert

## Introduction

Plaintiff, employed by General Motors, was targeted by several General Motors' supervisors in order to cause the Plaintiff to be terminated from his UAW represented employment; either by the Plaintiff quitting under duress or contractual termination by company. The defendants conspired to work with each other by coordinating disciplinary actions in order to elevate the level of discipline, reporting Plaintiff's location throughout his shift seeking opportunities to initiate disciplinary actions, fabricating allegations at times the Plaintiff was alone and no

**EXHIBIT A**

witnesses. Their objective was to discipline the Plaintiff, and then escort him through the plant, with guards, and parade him in front of his coworkers in order to humiliate him. Several of these disciplinary actions were reversed by the grievance process. However, the collective bargaining agreement is not intended to, nor does it provide remedies for the defendants' violations of the Plaintiff's civil rights.

### Parties

Plaintiff: Timothy Eckert Sr., an individual residing at 7571 Fairview Dr, Lockport, NY 14094.

Defendants: Agustus Batcho, an individual employed at General Motors Lockport, NY 14094; Chad Lasher, an individual employed at General Motors Lockport, NY 14094; Cory Lasher, an individual employed at General Motors Lockport, NY 14094. Carmello Arroyo, an individual previously employed at General Motors Lockport, NY 14094; William Nelson, an individual employed at General Motors Lockport, NY 14094; Louis Malone, an individual previously employed at General Motors Lockport, NY 14094; Michael Paul, an individual employed at General Motors Lockport, NY 14094.

### Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to New York Civil Practice Law and Rules (CPLR) § 301. Venue is proper in this county because the defamatory statements were published in this county and the plaintiff resides in this county.

Citations:
N.Y. C.P.L.R. § 301

### Factual Background

Complaint - 2

**EXHIBIT A**

1. Plaintiff accepted an offer of employment, for Industrial Electrician position, from General Motors on 8/24/2020, was assigned to the "Condenser" department, and successfully completed the 90-day probationary period without incident.

2. Management and hourly co-workers regarded Plaintiff as a highly skilled and valued Industrial Electrician.

3. During his 18 months in Condensers, Plaintiff was never disciplined because he consistently performed his assigned work successfully, reported to work as scheduled, and showed respect for all co-workers. Plaintiff routinely worked through his break and lunch periods in order to serve the company's best interest.

4. At one point the Superintendent stated to the Plaintiff "I hear you're crushing it, good job"

5. Following his 18-month success in the Condenser department, management re-assigned Plaintiff to Radiators department.

6. In 2022, Defendants Michael Paul, Mr. Nelson, Lou Malone, Chad Lasher, Cory Lasher, Carmello Arroyo, Augustus Batcho, acting in concert with one another, began a campaign to defame Plaintiff and terminate his employment.

7. Defendants conspired to create and disseminate false and defamatory statements about Plaintiff, alleging misconduct and violations of company policies.

8. Defendants communicated these false statements to human resources through oral and written statements and transmitted them via electronic interstate communications.

9. Mr. Nelson instructed the Plaintiff to perform electrical/mechanical work on an extruder press, which had been operating at 700 F degrees.

10. Plaintiff went to the machine and observed the extruder temperature was 254 degrees F.

**EXHIBIT A**

11. During his probationary period, members of Plaintiff's electrical team trained him to first de-energize the extruder and then wait for it to cool to a serviceable temperature, usually 100 degrees F, before performing this work.

12. Plaintiff consistently followed this practice while working in the Condenser department.

13. Plaintiff requested help from UAW committeeman Jeff Higgins, who then called the safety department. As a result, the safety department issued a rule prohibiting work on the extruder barrel until it is less than 125 degrees F.

14. On or about 7/1/2022 Mr. Nelson, initiated a disciplinary action, and falsely stated and published the Plaintiff was restricting his work output.

15. On or about 10/7/2022 Nelson falsely reported to General Motors that he saw the Plaintiff "walking through the die shop area at 240pm (2:40 PM) heading up to 7A to leave for the day." Nelson falsely stated and published Plaintiff left his department or work area.

16. On or about 4/11/2023 Mr. Nelson set into motion a scheme he devised, believing it would lead to Plaintiff being disciplined for failure to perform a job. Mr. Nelson instructed the Plaintiff, in the presence of David Barnard, "you're on oven watch" at the start of his shift. David Barnard is an hourly employee who occasionally serves as a UAW representative.

17. Oven watch typically means to examine the ovens for alarms, and if an alarm is encountered, resolve the problem.

18. The following Monday, Neslon approached the Plaintiff and stated he is initiating disciplinary actions against him (the plaintiff). Nelson alleged the Plaintiff failed to inform him of an oven that was being serviced and not in operation, and leaving (2) degreasers down.

**EXHIBIT A**

19. Mr. Nelson notified UAW committeeman Dave Barnard of the charges he initiated.

20. During the daily shift-change management meeting, someone notified Mr. Nelson that the oven was being serviced. Earlier planning meetings also informed Nelson that the oven would be serviced the upcoming weekend, and the daily work display showed it down.

21. Mr. Nelson did not instruct Plaintiff to start up degreasers.

22. Plaintiff contacted HR agent Jodi West and explained Mr. Nelson's scheme.

23. Upon information and belief, Mr. Nelson's superiors instructed him to end the disciplinary action he initiated.

24. Nelson, Lasher, and Arroyo conspired to falsely accuse Plaintiff of "hiding himself" to sleep.

25. About 2/2/2023 Arroyo falsely stated and published that Plaintiff was deliberately sleeping during working hours.

26. About 4/6/2023 Chad Lasher falsely stated and published that he observed the Plaintiff sleeping in a secluded area and falsely stated and published that the Plaintiff was 'waiting in the locker room to punch out'.

27. About 4/7/2023 Chad Lasher changed his story and falsely alleged he called the Plaintiff on the radio and Plaintiff failed to respond.

28. On 3/23/2023 Carmello Arroyo falsely stated and published that he observed Plaintiff sleeping during working hours.

29. On 3/27/2023 Carmello Arroyo falsely stated and published that he observed Plaintiff sleeping during working hours.

**EXHIBIT A**

30. About 8/15/23 Arroyo falsely stated and published, "Lost almost 1 hour on machine downtime due to Tim sleeping and having to go look for him."

31. Arroyo and Lasher devised and implemented a scheme that would increase the Plaintiff's workload. The normal operating practice

32. After several days of bearing the weight of the scheme, Plaintiff asked UAW to intervene and the scheme was ended.

33. Cory Lasher introduced this scheme to Batcho, and Batcho implemented it about May 2024

34. Lou Malone on or about 9/20/2023 falsely stated the Plaintiff did not work a shift he was assigned to work. Malone and Arroyo conspired to fabricate a story indicating that Malone disciplined Plaintiff for not reporting for overtime, allowing Arroyo to contractually suspend Plaintiff's employment for another alleged violation of being late for work.

35. On or about 12/10/2023 Mr. Scalzo, the Plaintiff's regular Supervisor at that time, stated to the Plaintiff that Lou Malone has alleged, on multiple occasions, the Plaintiff is leaving work early; Mr. Scalzo's exact wording was "Lou Malone is getting in my shorts about you leaving early" and attempting to force Mr. Scalzo to discipline the Plaintiff.

36. Mr. Scalzo stated that he trusts his people and declined to believe Lou Malone's accusations.

37. About 7/2023 Arroyo falsely stated and published the Plaintiff refused to do a job. Arroyo summoned Plaintiff to dept 481, pointed to an electrical circuit breaker box, and instructed Plaintiff, "Look on the written list identifying the circuits being used, and turn off any circuit breakers that are not listed in use."

**EXHIBIT A**

38. Plaintiff examined the list and then informed Arroyo that the numbering on the list did not correspond to the numbering on the circuit breakers, preventing him from identifying the circuit breakers not being used. Arroyo became irate and began screaming that he "orders" the Plaintiff to perform the task, despite being informed the conditions make it impossible to determine which circuit breakers were not being used.

39. Another electrician was summoned, and he also was unable to determine which circuit breakers were not in-use by comparing the list numbers to the circuit breaker numbers.

40. Defendant Chad Lasher, a supervisor for General Motors Components, was supervising the repair of a plastic extruder machine on Saturday, May 4, 2024.

41. The project involves electrical work, to be performed by a Journeyman Electrician, and mechanical work, to be performed by a Journeyman Machine Repairman (MR).

42. On May 4, 2024, the Defendant, Augustus Batcho, approached the Plaintiff and stated "go to press 712 and remove the heater bands"

43. The Plaintiff went to press 712; he observed the 480 volt energy source switch was in the "OFF" position.

44. A management-controlled "shop-lock" was attached, preventing it from being switched to the "ON" position. Chad Lasher placed the shop-lock on the switch.

45. The Plaintiff observed that (2) heater bands had been removed by another electrician, the ends of the wires were bare, and still connected to their energy source.

46. General Motors policy requires the supervisor, Chad Lasher to provide an "orange card", one for each trade, on the machine being serviced. Chad Lasher placed just one orange card for the machine repair trade and no other for the electrical trade.

Complaint - 7

**EXHIBIT A**

47. The unidentified electrician, who removed the nozzle heater bands did not document his work on the orange card designated for machine repairmen.

48. Per the instruction given by defendant Augustus Batcho, the Plaintiff removed (11) heater bands, and sent a text, to Batcho, the heater bands were removed.

49. Batcho responded "thanks"

50. The Plaintiff possess 36 years experience as a Journeyman Electrician, and 29 years experience as a Master Electrician and has performed similar tasks many, many times. The Plaintiff performed the scope of work as directed by Batcho

51. Defendants, in violation of General Motors policy, failed to inform the Plaintiff the machine would be re-energized after the heater bands were removed. Plaintiff followed industry standard procedures repairing machinery that would not be re-energized until it was fully re-assembled.

52. The standard industry procedure is to leave electrical components with flexible wiring connected, dismounted, and set aside.

53. The heater bands' electrical connection points are "open-wiring". In other words, these connection points are not insulated or encapsulated to prevent electrical shock or arc flash, they are not designed to be energized while in a disassembled state; the result of doing so could be fatal to employees.

54. Plaintiff laid the heater bands on the metal base of the machine, and returned to the shop.

55. At the time the Plaintiff left the machine, the shop lock was in place, preventing the machine from being energized. Therefore, the machine is considered by OSHA, to be in a "electrically safe condition".

**EXHIBIT A**

56. Shortly after, Augustus Batcho called the Plaintiff on his radio and stated "there was an arc flash and you need to return to the machine and disconnect the wires".

57. Plaintiff returned to the machine, disconnected the wires and labeled them.

58. When Plaintiff returned to the machine, he observed what he believed to be the machine repairman's bike but did not see any employees near the machine. Being concerned about the health of the machine repairman (MR), Plaintiff contacted a union committeeman and expressed his concern about the MR employee.

59. The UAW committeeman notified the Health and Safety Agent who subsequently took the Plaintiff's statement regarding the incident.

60. Neither Chad Lasher nor Mr. Batcho asked the Plaintiff if it was safe to re-energize the machine.

61. General Motors established an "Orange Card" policy "All workers, no matter the trade, are required to update the orange card with anything that has been disassembled and not reassembled. A copy of a GM "safety talk" on its orange card policy is attached as **Exhibit "F"."** (Atty Stefan Borovina)

62. The orange card reads "At Lockport we have had a few recent near miss incidents involving the re-energizing of equipment that had been taken apart and not put back to original condition."

63. On May 4, 2024 Chad Lasher, in violation of the "orange card" policy, and not knowing if it was safe to do so, removed his shop-lock from the machine and instructed the MR employee to energize the machine.

64. General Motors Safety Policy requires compliance with OSHA and National Fire Protection Association 70E (NFPA70E) rules.

**EXHIBIT A**

65. NFPA70E is a publication set forth by the National Fire Protection Association for the purpose of establishing standard electrical work-place safety rules.

66. NFPA70E Article 110.5(I) requires a "Job Briefing" whenever employees are assigned to perform work that involves electrical safety hazards:

> *Before starting each job that involves exposure to electrical hazards, the*
> *employee in charge shall complete a job safety plan and conduct a job briefing*
> *with the employees involved.*
> *Job Safety Planning.*
> *The job safety plan shall be in accordance with the following:*
> *(1) Be completed by a qualified person*
> *(2) Be documented*
> *(3) Include the following information:*
> *a. A description of the job and the individual tasks*
> *b. Identification of the electrical hazards associated with each task*
> *c. An electric shock risk assessment in accordance with 130.4 for tasks*
> *involving an electric shock hazard*
> *d. An arc flash risk assessment in accordance with 130.5 for tasks involving an*
> *arc flash hazard*
> *e. Work procedures involved, special precautions, and energy source controls*

67. General Motors' employees were exposed to death by electrocution as a result of Chad Lasher's gross negligence.

68. On or about May 10, 2024 Chad Lasher and Augustus Batcho summoned the Plaintiff to a disciplinary hearing. Chad Lasher falsely stated the Plaintiff was instructed to "unwire the heater bands". The Plaintiff replied that is not true, and that he was instructed to remove the bands.

69. Lasher then pointed towards Batcho, and while looking at the floor, he falsely stated that he instructed the Plaintiff to "unwire the heater bands".

70. About May 10, 2024 Chad Lasher and Michael Paul engaged in witness tampering while coordinating fraudulent statements with Batcho

**EXHIBIT A**

71. Immediately Committeeman Matt Balash also present at this meeting, accused Batcho of lying because Batcho "won't even look at him (the Plaintiff)"

72. On or about May 17, 2024 Chad Lasher and Augustus Batcho summoned the Plaintiff to another hearing, and falsely stated and published the Plaintiff failed to perform the job that was assigned, and failed to label the wires he disconnected, and failed to answer his radio.

73. Chad Lasher then stated "Let's go Eckert, you're out of here" and the Plaintiff was suspended from work, and escorted out of the building in view of his peers.

74. Cory Lasher, Chad Lasher, Carmello Arroyo, and Augustus Batcho devised a scheme that would result in adding additional work load upon the Plaintiff, and instituted that plan on several dates, one of which occurred on or about May 29, 2024.

75. Chad Lasher, Cory Lasher, Carmello Arroyo, Mr. Nelson, Lou Malone, and Mike Paul conspired together and amongst themselves to locate the Plaintiff throughout his shift, and report to one another his location. In cases where the Plaintiff was isolated from other employees, the aforementioned schemed to make false allegations, and on multiple occasions libeled and slandered the Plaintiff making claims that he is sleeping on the job, or missing from the job.

76. Upon information and belief, Michael Paul, supervisor of the other defendants, instructed them to fabricate violations of Company rules and discipline the Plaintiff for those fabrications.

77. Lou Malone had stated during an official disciplinary hearing, "this is what the big guy wants" a reference to Michael Paul. Plaintiff, and Dave Barnard, UAW committeeman was present.

**EXHIBIT A**

78. As part of the grievance procedure, unfounded disciplinary actions are to be removed from Plaintiff's employment record, they were not. Plaintiff requested Committeeman Jeff Higgins to assist in removing unwarranted reports, and they were removed.

79. Lou Malone continually re-inserted the removed reports back into Plaintiff's record for the purpose of damaging the Plaintiff's image perceived by both management and fellow employees.

80. Each of the defendants transmitted, across interstate wire, falsified business records while engaged in the concerted act of targeting the Plaintiff.

81. The defendants' conduct is so extreme and outrageous that it exceeds all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

82. General Motors, through it's attorney Stefan Borovina, served falsified business records to a government agency investigating the Lockport, NY site.

83. On 10/5/24 John Doe 1, and John Doe2 communicated to General Motors

*On Friday 9/27/24 "C" shift you were assigned to repair the K5 clinch in 481. At approximately 1830 the electrical panel doors were found to be open You were observed walking back to the machine with parts to repair it. The equipment was not locked out. Why were the electrical panel doors left open with nobody around and without the equipment properly locked out'*

84. Upon information and belief John Doe3, and John Doe4 were provided sufficient evidence the allegations above were not true. Furthermore, John Doe3, and John Doe4 ignored the collective bargaining agreement, and imposed a much harsher discipline than permitted.

### **Causes of Action :**

### **Defamation**

**EXHIBIT A**

85. The plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Each of the defendants conspired to defame the Plaintiff for the purpose of causing him to quit or be fired. in [Pinkerton v. United States, 328 U.S. 640 (1946)], the Supreme Court held that a conspirator can be held liable for the substantive offenses committed by co-conspirators if those offenses were committed in furtherance of the conspiracy and were reasonably foreseeable.

87. In cases of conspiracy, courts often apply the doctrine of joint and several liability. This means that each conspirator can be held liable for the entire harm caused by the conspiracy, regardless of their individual level of participation. This principle was affirmed in [United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940)], where the Supreme Court held that each member of a conspiracy is responsible for the acts of their co-conspirators that are done in furtherance of the conspiracy.

88. In summary, under the prevailing legal standards, all conspirators who sought to tarnish the employee's reputation can be held both criminally and civilly accountable for their malicious actions.

89. The defendants made numerous false and defamatory statements about the plaintiff.

90. These statements were published to third parties without privilege or authorization, thereby constituting Defamation.

91. The defendants exhibited actual malice or gross negligence in propagating These statements.

**EXHIBIT A**

92. Defendant's conduct directly and proximately caused harm to the plaintiff's reputation, suffer severe emotional distress, including but not limited to fearing the start of each shift and being encumbered with anxiety throughout the shift.

## RICO Act and Civil Conspiracy

93. Under 18 U.S.C. § 1962(c), a plaintiff must demonstrate: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity [18 U.S.C. § 1962(c)].

94. The defendants engaged in witness tampering, mail fraud, wire fraud, conspiracy to commit fraud, falsifying business records served upon a government agency investigating General Motors, and considered predicate acts under RICO

95. In this case, the supervisors' actions in fabricating workplace violations and initiating disciplinary actions are considered as participating in the operation of the enterprise. [Reves v. Ernst & Young, 507 U.S. 170 (1993)].

96. The defendants formed an enterprise when they conspired with a unified purpose to engage in the conduct detailed herein. [Boyle v. United States, 556 U.S. 938 (2009)]

97. The defendants used mail and electronic communications to disseminate false information about the plaintiff, actions that constitute mail or Wire Fraud under 18 U.S.C. §§ 1341 and 1343.

98. The defendants fabricated workplace violations and initiated disciplinary actions as part of a broader scheme to defame and terminate his employment.

**EXHIBIT A**

99. The defendants committed multiple acts of fraud and other predicate offenses, constituting a pattern of racketeering activity, as part of a coordinated effort to harm his reputation and employment status.

## Civil Conspiracy

100.    The defendants conspired to coordinate attacks on the Plaintiff by developing tactics to impose harsher penalties for alleged disciplinary actions.

101.    The defendants conspired to surveil the plaintiff, despite not being assigned to supervise him, and reported their surveillance to one another.

102.    The defendants colluded to fabricate workplace violations, thereby aiding each other in imposing harsher disciplinary measures.

103.    The defendants caused the Plaintiff to suffer loss of wages and humiliated him numerous times by escorting him from the building with guards, in full view of his co-workers.

## Willful Infliction of Severe Emotional Distress

104.    The plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105.    The defendants' conduct is so extreme and outrageous that it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. [Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993)].

**EXHIBIT A**

106.    The defendants' objective was to inflict an enormous amount of distress upon the

Plaintiff to cause him not to return to work.

107.    Causal Connection: There must be a direct causal connection between the

defendants' conduct and the emotional distress suffered by the plaintiff.

    A.  The defendants caused the plaintiff to suffer loss of wages and benefits.

    B.  The defendants humiliated Plaintiff dozens of times by parading him before his

       co-workers while escorting him from the building.

    C.  The Plaintiff's co-workers had begun to treat him with contempt.

    D.  The defendants severely damaged Plaintiff's reputation.

108.    As a direct and proximate result of the defendants' conduct, the Plaintiff has

suffered severe emotional distress, including but not limited to fearing the start of each

shift and being encumbered with anxiety throughout the shift. Plaintiff required

medication, prescribed by his physician, to mitigate the severe distress inflicted upon

him.

**Prayer for Relief**

WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in their favor

and against the defendant as follows:

Michael Paul - $1,000,000

William Nelson - $1,500,000

Carmello Arroyo - $1,500,000

Chad Lasher - $1,500,000

**EXHIBIT A**

Cory Lasher - $500,000

Augustus Batcho - $1,500,000

Lou Malone - $1,000,000

1. Special damages that include lost wages, lost potential wages, and medical costs.

2. Award compensatory damages in an amount to be determined at trial;

3. Award punitive damages in an amount to be determined at trial;

4. Awarding costs and attorneys' fees,

5. Grant such other and further relief as the Court deems just and proper.

Jury Demand

The plaintiff demands a trial by jury on all triable issues.

Signature

Timothy Eckert, Pro-Se

138 East Ave, Suite 875

Lockport, NY 14095

**EXHIBIT A**

At the IAS Part _____ of the Supreme Court of the State of New York, held in and for the County of Niagara, at the Courthouse thereof, 773 Third Street, 2nd Floor, Niagara Falls, New York 14302, on the _____ day of November 2024.

PRESENT:

Hon._____

PAID

NOV 2 6 2024

JOSEPH A. JASTRZEMSKI
NIAGARA COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
_____

TIMOTHY ECKERT,

          PLAINTIFF,

v.

MICHAEL PAUL, WILLIAM NELSON, AUGUSTUS
BATCHO, CHAD LASHER, CORY LASHER,
CARMELO ARROYO, LOUIS MALONE,

          DEFENDANTS.
_____

**ORDER TO SHOW CAUSE**

INDEX NO.: 185074/2024

Upon the Affirmation of R. Scott DeLuca, Esq., sworn to on the 26th day of November, 2024 and all prior pleadings and proceedings had herein, it is hereby:

ORDERED that Plaintiff show cause before this Court at IAS Part _____, to be held in and for the Country of Niagara at the Courthouse thereof, 773 Third Street, 2nd Floor, Niagara Falls, New York 14302, Room _____ on the _____ day of December 2024, at _____ o'clock in the fore/afternoon of that day, or as soon thereafter as Plaintiff and counsel for Defendants can be heard, why an order should not be entered, pursuant to N.Y. C.P.L.R. § 2004 (giving this court

**EXHIBIT A**

authority to extend most time limits or excuse untimeliness, except statutes of limitation), granting the motion of Ogletree, Deakins, Nash, Smoak & Stewart, P.C. to extend all Defendants' time to answer or otherwise respond to Plaintiff's Complaint in this action to December 19, 2024, and it is further

ORDERED that service of this Order to Show Cause upon Plaintiff, together with the papers upon which it was granted, shall be deemed good and sufficient if sent via first class mail to Plaintiff's home address as set forth on the Summons in this action; and it is further

ORDERED that service as set forth in the previous paragraph of this Order shall be accomplished by delivery of said papers to a representative of the United States Postal Service on or before the 27th day of November 2024; and it is further

ORDERED that papers in opposition, if any, shall be served by overnight mail on Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 50 Fountain Plaza, Suite 1400, Buffalo, New York 14202, (Attn.: R. Scott DeLuca, Esq.), so as to be received on or before the 5th day of December 2024; and it is further;

ORDERED that this action, including deadlines for responding to pleadings, shall be temporarily stayed for twenty-one (21) days from the date of this Order.

ENTERED:

_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
_____

TIMOTHY ECKERT,

               PLAINTIFF,

v.

MICHAEL PAUL, WILLIAM NELSON, AUGUSTUS
BATCHO, CHAD LASHER, CORY LASHER,
CARMELO ARROYO, LOUIS MALONE,

               DEFENDANTS.
_____

**AFFIRMATION OF
R. SCOTT DeLUCA, ESQ.**

INDEX NO.:  185074/2024

R. SCOTT DeLUCA, ESQ. states the following under the penalty of perjury:

1.      I am an attorney duly admitted to practice law in the State of New York and am Of Counsel with the law firm Ogletree, Deakins, Nash, Smoak & Stewart P.C., attorneys for four defendants (William Nelson, Augustus Batch, Chad Lasher, and Cory Lasher) and potentially the remaining defendants in this action. As such, I am fully familiar with the facts and circumstances set forth in this Affirmation.

2.      I submit this Affirmation in support of the Defendants' motion, by Order to Show Cause, for an extension of time to answer or otherwise respond to Plaintiff's Complaint in this action.

3.      Upon information and belief, Defendants have not previously asked this Honorable Court for any other extension or relief regarding this action.

4.      Plaintiff, proceeding *pro se*, commenced this action upon the filing of a Summons and Complaint with the Niagara County Clerk on October 25, 2024. I attach a true and correct copy of Plaintiff's Summons and Complaint hereto at **Exhibit A**. This action is not presently a NYSCEF case for which efiling may occur.

**EXHIBIT A**

5.    The four Defendants whom we currently represent (William Nelson, Augustus Batch, Chad Lasher, and Cory Lasher) were served by way of personal delivery at their places of work on or about November 6, 2024.

6.    My colleague, Sam Ottinger, Esq., made a telephone call to Plaintiff on November 25, 2024, to request a brief extension of time for Defendants to serve and file responses to Plaintiff's Complaint, and also exchanged e-mails with Plaintiff reflecting that Plaintiff refused Mr. Ottinger's request.

7.    As we have recently been retained by four of the Defendants in this action, and in in order to fully investigate Plaintiff's allegations and submit responsive pleadings and possibly to be retained by the remaining Defendants, we seek additional time for all Defendants to answer or otherwise respond to the Complaint in this action.

8.    Upon information and belief, the extension of time sought on behalf of all Defendants will not prejudice or harm Plaintiff in any manner, and is within the discretion of this Court to grant. *See* N.Y. C.P.L.R. § 2004. Moreover, the extension of time sought on behalf of all Defendants is the type of extension that would normally be granted (as a professional courtesy) in a case where all parties are represented by counsel.

**WHEREFORE**, Defendants respectfully request the court to grant the motion of Ogletree, Deakins, Nash, Smoak & Stewart, P.C.:

    a.    to extend all Defendants' time to answer or otherwise respond to Plaintiff's Complaint in this action to December 19, 2024;

    b.    that service of the Order to Show Cause upon Plaintiff, together with the papers upon which it was granted, shall be deemed good and sufficient if made via first class mail to Plaintiff's home address as set forth on the Summons in this action;

**EXHIBIT A**

    c.   that service of the Court's Order to Show Cause shall be accomplished on or before the 27th day of November 2024 (via first class U.S. Mail);

    d.   that papers in opposition, if any, shall be served by overnight mail to your Affirmant at Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 50 Fountain Plaza, Suite 1400, Buffalo, New York 14202, so as to be received on or before the 5th day of December 2024;

    e.   that this action, including deadlines for responding to pleadings, shall be temporarily stayed for twenty-one (21) days from the date of the Court's Order to Show Cause; and

    f.   such other and further relief as it deems just and proper.

DATED:    Lockport, New York
              November 26, 2024

                              R. Scott DeLuca, Esq.

86796088.v1-OGLETREE

**EXHIBIT A**

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF _Niagara_____

\-------------------------------------------------------------

Timothy Eckert
_____

_____

_____

(Names of Plaintiff(s)/Petitioner(s)

**VS**

Michael Paul, William Nelson, Augustus Batcho, Chad Lasher,
_____

Cory Lasher, Carmelo Arroyo, Louis Malone
_____

_____

(Names of Defendant(s)/Respondent(s)

\-------------------------------------------------------------

**ORIGINAL FILED**

**OCT 2 5 2024**

JOSEPH A. JASTRZEMSKI
NIAGARA COUNTY CLERK

SUMMONS

**185074/2024**

10/25/2024  02:11:31 PM
Receipt # 2024662606
2 Pages

Joseph A. Jastrzemski, Niagara County Clerk          Clerk: LMK

To the Person(s) Named as Defendant(s) Above:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: _October 24_____. 20_24_
　　　　(Date of Summons)

Timothy Eckert
_____
(Plaintiff(s) name - person bringing on lawsuit)
7571 Fairview Drive
_____
(Plaintiff(s) street address)
Lockport, New York 14094
_____
(Plaintiff(s) city, state, zip)
7165660767
_____
(Plaintiff(s) telephone no.)

See Page 2
_____
(Defendant(s) name - person(s) sued)

_____
(Defendant(s) street address)

_____
(Defendant(s) city, state, zip)

Venue:　　Plaintiff(s) designate(s) _Niagara_____ County as the place of trial. The basis of this designation is: (Enter County above; then select one category below, listing specific County)

　　　　XⓍ　　Plaintiff(s)' Residence in _Niagara_____ County.
　　　　☐　　Defendant(s)' Residence in _____ County.
　　　　☐　　Other -- Describe: _____.

**NOTE:  THIS FORM OF SUMMONS MUST BE SERVED WITH A COMPLAINT**

**EXHIBIT A**

Defendants

_Michael Paul
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_William Nelson
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Augustus Batcho
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Chad Lasher
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Cory Lasher
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Louis Malone
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

_Carmello Arroyo
(Defendant(s) name - person(s) sued)

(Defendant(s) street address)

(Defendant(s) city, state, zip)

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NIAGARA

**ORIGINAL FILED**

**OCT 2 5 2024**

JOSEPH A. JASTRZEMSKI
NIAGARA COUNTY CLERK

1
2
3

Timothy Eckert,

      Plaintiff,

    vs.

Michael Paul, Augustus Batcho, Chad Lasher,

Cory Lasher, William Nelson, Louis Malone,

Carmello Arroyo, John Doe1, John Doe2, John

Doe3, John Doe4

      Defendants

)
)
)
)
)
)
)
)
)
)
)

Case No.:

Complaint

COMPLAINT

**185074/2024**
10/25/2024 02:11:31 PM
Receipt # 2024662606
17 Pages

Joseph A. Jastrzemski, Niagara County Clerk    Clerk: LMK

Dated this 23rd day of October, 2024

7571 Fairview Dr.
Lockport, NY 14094
Pro Se :Timothy Eckert

## **Introduction**

Plaintiff, employed by General Motors, was targeted by several General Motors' supervisors in

order to cause the Plaintiff to be terminated from his UAW represented employment; either by

the Plaintiff quitting under duress or contractual termination by company. The defendants

conspired to work with each other by coordinating disciplinary actions in order to elevate the

level of discipline, reporting Plaintiff's location throughout his shift seeking opportunities to

initiate disciplinary actions, fabricating allegations at times the Plaintiff was alone and no

Complaint - 1

**EXHIBIT A**

witnesses. Their objective was to discipline the Plaintiff, and then escort him through the plant, with guards, and parade him in front of his coworkers in order to humiliate him. Several of these disciplinary actions were reversed by the grievance process. However, the collective bargaining agreement is not intended to, nor does it provide remedies for the defendants' violations of the Plaintiff's civil rights.

## Parties

Plaintiff: Timothy Eckert Sr., an individual residing at 7571 Fairview Dr, Lockport, NY 14094.

Defendants: Agustus Batcho, an individual employed at General Motors Lockport, NY 14094; Chad Lasher, an individual employed at General Motors Lockport, NY 14094; Cory Lasher, an individual employed at General Motors Lockport, NY 14094. Carmello Arroyo, an individual previously employed at General Motors Lockport, NY 14094; William Nelson, an individual employed at General Motors Lockport, NY 14094; Louis Malone, an individual previously employed at General Motors Lockport, NY 14094; Michael Paul, an individual employed at General Motors Lockport, NY 14094.

## Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to New York Civil Practice Law and Rules (CPLR) § 301. Venue is proper in this county because the defamatory statements were published in this county and the plaintiff resides in this county.

Citations:
N.Y. C.P.L.R. § 301

## Factual Background

Complaint - 2

**EXHIBIT A**

1. Plaintiff accepted an offer of employment, for Industrial Electrician position, from General Motors on 8/24/2020, was assigned to the "Condenser" department, and successfully completed the 90-day probationary period without incident.

2. Management and hourly co-workers regarded Plaintiff as a highly skilled and valued Industrial Electrician.

3. During his 18 months in Condensers, Plaintiff was never disciplined because he consistently performed his assigned work successfully, reported to work as scheduled, and showed respect for all co-workers. Plaintiff routinely worked through his break and lunch periods in order to serve the company's best interest.

4. At one point the Superintendent stated to the Plaintiff "I hear you're crushing it, good job"

5. Following his 18-month success in the Condenser department, management re-assigned Plaintiff to Radiators department.

6. In 2022, Defendants Michael Paul, Mr. Nelson, Lou Malone, Chad Lasher, Cory Lasher, Carmello Arroyo, Augustus Batcho, acting in concert with one another, began a campaign to defame Plaintiff and terminate his employment.

7. Defendants conspired to create and disseminate false and defamatory statements about Plaintiff, alleging misconduct and violations of company policies.

8. Defendants communicated these false statements to human resources through oral and written statements and transmitted them via electronic interstate communications.

9. Mr. Nelson instructed the Plaintiff to perform electrical/mechanical work on an extruder press, which had been operating at 700 F degrees.

10. Plaintiff went to the machine and observed the extruder temperature was 254 degrees F.

**EXHIBIT A**

11. During his probationary period, members of Plaintiff's electrical team trained him to first de-energize the extruder and then wait for it to cool to a serviceable temperature, usually 100 degrees F, before performing this work.

12. Plaintiff consistently followed this practice while working in the Condenser department.

13. Plaintiff requested help from UAW committeeman Jeff Higgins, who then called the safety department. As a result, the safety department issued a rule prohibiting work on the extruder barrel until it is less than 125 degrees F.

14. On or about 7/1/2022 Mr. Nelson, initiated a disciplinary action, and falsely stated and published the Plaintiff was restricting his work output.

15. On or about 10/7/2022 Nelson falsely reported to General Motors that he saw the Plaintiff "walking through the die shop area at 240pm (2:40 PM) heading up to 7A to leave for the day." Nelson falsely stated and published Plaintiff left his department or work area.

16. On or about 4/11/2023 Mr. Nelson set into motion a scheme he devised, believing it would lead to Plaintiff being disciplined for failure to perform a job. Mr. Nelson instructed the Plaintiff, in the presence of David Barnard, "you're on oven watch" at the start of his shift. David Barnard is an hourly employee who occasionally serves as a UAW representative.

17. Oven watch typically means to examine the ovens for alarms, and if an alarm is encountered, resolve the problem.

18. The following Monday, Neslon approached the Plaintiff and stated he is initiating disciplinary actions against him (the plaintiff). Nelson alleged the Plaintiff failed to inform him of an oven that was being serviced and not in operation, and leaving (2) degreasers down.

**EXHIBIT A**

19. Mr. Nelson notified UAW committeeman Dave Barnard of the charges he initiated.

20. During the daily shift-change management meeting, someone notified Mr. Nelson that the oven was being serviced. Earlier planning meetings also informed Nelson that the oven would be serviced the upcoming weekend, and the daily work display showed it down.

21. Mr. Nelson did not instruct Plaintiff to start up degreasers.

22. Plaintiff contacted HR agent Jodi West and explained Mr. Nelson's scheme.

23. Upon information and belief, Mr. Nelson's superiors instructed him to end the disciplinary action he initiated.

24. Nelson, Lasher, and Arroyo conspired to falsely accuse Plaintiff of "hiding himself" to sleep.

25. About 2/2/2023 Arroyo falsely stated and published that Plaintiff was deliberately sleeping during working hours.

26. About 4/6/2023 Chad Lasher falsely stated and published that he observed the Plaintiff sleeping in a secluded area and falsely stated and published that the Plaintiff was 'waiting in the locker room to punch out'.

27. About 4/7/2023 Chad Lasher changed his story and falsely alleged he called the Plaintiff on the radio and Plaintiff failed to respond.

28. On 3/23/2023 Carmello Arroyo falsely stated and published that he observed Plaintiff sleeping during working hours.

29. On 3/27/2023 Carmello Arroyo falsely stated and published that he observed Plaintiff sleeping during working hours.

**EXHIBIT A**

30. About 8/15/23 Arroyo falsely stated and published, "Lost almost 1 hour on machine downtime due to Tim sleeping and having to go look for him."

31. Arroyo and Lasher devised and implemented a scheme that would increase the Plaintiff's workload. The normal operating practice

32. After several days of bearing the weight of the scheme, Plaintiff asked UAW to intervene and the scheme was ended.

33. Cory Lasher introduced this scheme to Batcho, and Batcho implemented it about May 2024

34. Lou Malone on or about 9/20/2023 falsely stated the Plaintiff did not work a shift he was assigned to work. Malone and Arroyo conspired to fabricate a story indicating that Malone disciplined Plaintiff for not reporting for overtime, allowing Arroyo to contractually suspend Plaintiff's employment for another alleged violation of being late for work.

35. On or about 12/10/2023 Mr. Scalzo, the Plaintiff's regular Supervisor at that time, stated to the Plaintiff that Lou Malone has alleged, on multiple occasions, the Plaintiff is leaving work early; Mr. Scalzo's exact wording was "Lou Malone is getting in my shorts about you leaving early" and attempting to force Mr. Scalzo to discipline the Plaintiff.

36. Mr. Scalzo stated that he trusts his people and declined to believe Lou Malone's accusations.

37. About 7/2023 Arroyo falsely stated and published the Plaintiff refused to do a job. Arroyo summoned Plaintiff to dept 481, pointed to an electrical circuit breaker box, and instructed Plaintiff, "Look on the written list identifying the circuits being used, and turn off any circuit breakers that are not listed in use."

**EXHIBIT A**

38. Plaintiff examined the list and then informed Arroyo that the numbering on the list did not correspond to the numbering on the circuit breakers, preventing him from identifying the circuit breakers not being used. Arroyo became irate and began screaming that he "orders" the Plaintiff to perform the task, despite being informed the conditions make it impossible to determine which circuit breakers were not being used.

39. Another electrician was summoned, and he also was unable to determine which circuit breakers were not in-use by comparing the list numbers to the circuit breaker numbers.

40. Defendant Chad Lasher, a supervisor for General Motors Components, was supervising the repair of a plastic extruder machine on Saturday, May 4, 2024.

41. The project involves electrical work, to be performed by a Journeyman Electrician, and mechanical work, to be performed by a Journeyman Machine Repairman (MR).

42. On May 4, 2024, the Defendant, Augustus Batcho, approached the Plaintiff and stated "go to press 712 and remove the heater bands"

43. The Plaintiff went to press 712; he observed the 480 volt energy source switch was in the "OFF" position.

44. A management-controlled "shop-lock" was attached, preventing it from being switched to the "ON" position. Chad Lasher placed the shop-lock on the switch.

45. The Plaintiff observed that (2) heater bands had been removed by another electrician, the ends of the wires were bare, and still connected to their energy source.

46. General Motors policy requires the supervisor, Chad Lasher to provide an "orange card", one for each trade, on the machine being serviced. Chad Lasher placed just one orange card for the machine repair trade and no other for the electrical trade.

Complaint - 7

**EXHIBIT A**

47. The unidentified electrician, who removed the nozzle heater bands did not document his work on the orange card designated for machine repairmen.

48. Per the instruction given by defendant Augustus Batcho, the Plaintiff removed (11) heater bands, and sent a text, to Batcho, the heater bands were removed.

49. Batcho responded "thanks"

50. The Plaintiff possess 36 years experience as a Journeyman Electrician, and 29 years experience as a Master Electrician and has performed similar tasks many, many times. The Plaintiff performed the scope of work as directed by Batcho

51. Defendants, in violation of General Motors policy, failed to inform the Plaintiff the machine would be re-energized after the heater bands were removed. Plaintiff followed industry standard procedures repairing machinery that would not be re-energized until it was fully re-assembled.

52. The standard industry procedure is to leave electrical components with flexible wiring connected, dismounted, and set aside.

53. The heater bands' electrical connection points are "open-wiring". In other words, these connection points are not insulated or encapsulated to prevent electrical shock or arc flash, they are not designed to be energized while in a disassembled state; the result of doing so could be fatal to employees.

54. Plaintiff laid the heater bands on the metal base of the machine, and returned to the shop.

55. At the time the Plaintiff left the machine, the shop lock was in place, preventing the machine from being energized. Therefore, the machine is considered by OSHA, to be in a "electrically safe condition".

**EXHIBIT A**

56. Shortly after, Augustus Batcho called the Plaintiff on his radio and stated "there was an arc flash and you need to return to the machine and disconnect the wires".

57. Plaintiff returned to the machine, disconnected the wires and labeled them.

58. When Plaintiff returned to the machine, he observed what he believed to be the machine repairman's bike but did not see any employees near the machine. Being concerned about the health of the machine repairman (MR), Plaintiff contacted a union committeeman and expressed his concern about the MR employee.

59. The UAW committeeman notified the Health and Safety Agent who subsequently took the Plaintiff's statement regarding the incident.

60. Neither Chad Lasher nor Mr. Batcho asked the Plaintiff if it was safe to re-energize the machine.

61. General Motors established an "Orange Card" policy "All workers, no matter the trade, are required to update the orange card with anything that has been disassembled and not reassembled. A copy of a GM "safety talk" on its orange card policy is attached as **Exhibit "F"**." (Atty Stefan Borovina)

62. The orange card reads "At Lockport we have had a few recent near miss incidents involving the re-energizing of equipment that had been taken apart and not put back to original condition."

63. On May 4, 2024 Chad Lasher, in violation of the "orange card" policy, and not knowing if it was safe to do so, removed his shop-lock from the machine and instructed the MR employee to energize the machine.

64. General Motors Safety Policy requires compliance with OSHA and National Fire Protection Association 70E (NFPA70E) rules.

**EXHIBIT A**

65. NFPA70E is a publication set forth by the National Fire Protection Association for the purpose of establishing standard electrical work-place safety rules.

66. NFPA70E Article 110.5(I) requires a "Job Briefing" whenever employees are assigned to perform work that involves electrical safety hazards:

> *Before starting each job that involves exposure to electrical hazards, the*
> *employee in charge shall complete a job safety plan and conduct a job briefing*
> *with the employees involved.*
> *Job Safety Planning.*
> *The job safety plan shall be in accordance with the following:*
> *(1) Be completed by a qualified person*
> *(2) Be documented*
> *(3) Include the following information:*
> *a. A description of the job and the individual tasks*
> *b. Identification of the electrical hazards associated with each task*
> *c. An electric shock risk assessment in accordance with 130.4 for tasks*
> *involving an electric shock hazard*
> *d. An arc flash risk assessment in accordance with 130.5 for tasks involving an*
> *arc flash hazard*
> *e. Work procedures involved, special precautions, and energy source controls*

67. General Motors' employees were exposed to death by electrocution as a result of Chad Lasher's gross negligence.

68. On or about May 10, 2024 Chad Lasher and Augustus Batcho summoned the Plaintiff to a disciplinary hearing. Chad Lasher falsely stated the Plaintiff was instructed to "unwire the heater bands". The Plaintiff replied that is not true, and that he was instructed to remove the bands.

69. Lasher then pointed towards Batcho, and while looking at the floor, he falsely stated that he instructed the Plaintiff to "unwire the heater bands".

70. About May 10, 2024 Chad Lasher and Michael Paul engaged in witness tampering while coordinating fraudulent statements with Batcho

**EXHIBIT A**

71. Immediately Committeeman Matt Balash also present at this meeting, accused Batcho of lying because Batcho "won't even look at him (the Plaintiff)"

72. On or about May 17, 2024 Chad Lasher and Augustus Batcho summoned the Plaintiff to another hearing, and falsely stated and published the Plaintiff failed to perform the job that was assigned, and failed to label the wires he disconnected, and failed to answer his radio.

73. Chad Lasher then stated "Let's go Eckert, you're out of here" and the Plaintiff was suspended from work, and escorted out of the building in view of his peers.

74. Cory Lasher, Chad Lasher, Carmello Arroyo, and Augustus Batcho devised a scheme that would result in adding additional work load upon the Plaintiff, and instituted that plan on several dates, one of which occurred on or about May 29, 2024.

75. Chad Lasher, Cory Lasher, Carmello Arroyo, Mr. Nelson, Lou Malone, and Mike Paul conspired together and amongst themselves to locate the Plaintiff throughout his shift, and report to one another his location. In cases where the Plaintiff was isolated from other employees, the aforementioned schemed to make false allegations, and on multiple occasions libeled and slandered the Plaintiff making claims that he is sleeping on the job, or missing from the job.

76. Upon information and belief, Michael Paul, supervisor of the other defendants, instructed them to fabricate violations of Company rules and discipline the Plaintiff for those fabrications.

77. Lou Malone had stated during an official disciplinary hearing, "this is what the big guy wants" a reference to Michael Paul. Plaintiff, and Dave Barnard, UAW committeeman was present.

**EXHIBIT A**

78. As part of the grievance procedure, unfounded disciplinary actions are to be removed from Plaintiff's employment record, they were not. Plaintiff requested Committeeman Jeff Higgins to assist in removing unwarranted reports, and they were removed.

79. Lou Malone continually re-inserted the removed reports back into Plaintiff's record for the purpose of damaging the Plaintiff's image perceived by both management and fellow employees.

80. Each of the defendants transmitted, across interstate wire, falsified business records while engaged in the concerted act of targeting the Plaintiff.

81. The defendants' conduct is so extreme and outrageous that it exceeds all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

82. General Motors, through it's attorney Stefan Borovina, served falsified business records to a government agency investigating the Lockport, NY site.

83. On 10/5/24 John Doe 1, and John Doe2 communicated to General Motors

*On Friday 9/27/24 "C" shift you were assigned to repair the K5 clinch in 481. At approximately 1830 the electrical panel doors were found to be open You were observed walking back to the machine with parts to repair it. The equipment was not locked out. Why were the electrical panel doors left open with nobody around and without the equipment properly locked out'*

84. Upon information and belief John Doe3, and John Doe4 were provided sufficient evidence the allegations above were not true. Furthermore, John Doe3, and John Doe4 ignored the collective bargaining agreement, and imposed a much harsher discipline than permitted.

**Causes of Action :**

**Defamation**

**EXHIBIT A**

85. The plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Each of the defendants conspired to defame the Plaintiff for the purpose of causing him to quit or be fired. in [Pinkerton v. United States, 328 U.S. 640 (1946)], the Supreme Court held that a conspirator can be held liable for the substantive offenses committed by co-conspirators if those offenses were committed in furtherance of the conspiracy and were reasonably foreseeable.

87. In cases of conspiracy, courts often apply the doctrine of joint and several liability. This means that each conspirator can be held liable for the entire harm caused by the conspiracy, regardless of their individual level of participation. This principle was affirmed in [United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940)], where the Supreme Court held that each member of a conspiracy is responsible for the acts of their co-conspirators that are done in furtherance of the conspiracy.

88. In summary, under the prevailing legal standards, all conspirators who sought to tarnish the employee's reputation can be held both criminally and civilly accountable for their malicious actions.

89. The defendants made numerous false and defamatory statements about the plaintiff.

90. These statements were published to third parties without privilege or authorization, thereby constituting Defamation.

91. The defendants exhibited actual malice or gross negligence in propagating These statements.

**EXHIBIT A**

92. Defendant's conduct directly and proximately caused harm to the plaintiff's reputation, suffer severe emotional distress, including but not limited to fearing the start of each shift and being encumbered with anxiety throughout the shift.

### RICO Act and Civil Conspiracy

93. Under 18 U.S.C. § 1962(c), a plaintiff must demonstrate: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity [18 U.S.C. § 1962(c)].

94. The defendants engaged in witness tampering, mail fraud, wire fraud, conspiracy to commit fraud, falsifying business records served upon a government agency investigating General Motors, and considered predicate acts under RICO

95. In this case, the supervisors' actions in fabricating workplace violations and initiating disciplinary actions are considered as participating in the operation of the enterprise. [Reves v. Ernst & Young, 507 U.S. 170 (1993)].

96. The defendants formed an enterprise when they conspired with a unified purpose to engage in the conduct detailed herein. [Boyle v. United States, 556 U.S. 938 (2009)]

97. The defendants used mail and electronic communications to disseminate false information about the plaintiff, actions that constitute mail or Wire Fraud under 18 U.S.C. §§ 1341 and 1343.

98. The defendants fabricated workplace violations and initiated disciplinary actions as part of a broader scheme to defame and terminate his employment.

**EXHIBIT A**

99. The defendants committed multiple acts of fraud and other predicate offenses, constituting a pattern of racketeering activity, as part of a coordinated effort to harm his reputation and employment status.

## Civil Conspiracy

100.  The defendants conspired to coordinate attacks on the Plaintiff by developing tactics to impose harsher penalties for alleged disciplinary actions.

101.  The defendants conspired to surveil the plaintiff, despite not being assigned to supervise him, and reported their surveillance to one another.

102.  The defendants colluded to fabricate workplace violations, thereby aiding each other in imposing harsher disciplinary measures.

103.  The defendants caused the Plaintiff to suffer loss of wages and humiliated him numerous times by escorting him from the building with guards, in full view of his co-workers.

## Willful Infliction of Severe Emotional Distress

104.  The plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105.  The defendants' conduct is so extreme and outrageous that it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. [Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993)].

**EXHIBIT A**

106.    The defendants' objective was to inflict an enormous amount of distress upon the

Plaintiff to cause him not to return to work.

107.    Causal Connection: There must be a direct causal connection between the

defendants' conduct and the emotional distress suffered by the plaintiff.

    A.  The defendants caused the plaintiff to suffer loss of wages and benefits.

    B.  The defendants humiliated Plaintiff dozens of times by parading him before his

        co-workers while escorting him from the building.

    C.  The Plaintiff's co-workers had begun to treat him with contempt.

    D.  The defendants severely damaged Plaintiff's reputation.

108.    As a direct and proximate result of the defendants' conduct, the Plaintiff has

suffered severe emotional distress, including but not limited to fearing the start of each

shift and being encumbered with anxiety throughout the shift. Plaintiff required

medication, prescribed by his physician, to mitigate the severe distress inflicted upon

him.


**Prayer for Relief**


WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in their favor

and against the defendant as follows:

Michael Paul - $1,000,000

William Nelson - $1,500,000

Carmello Arroyo - $1,500,000

Chad Lasher - $1,500,000

**EXHIBIT A**

Cory Lasher - $500,000

Augustus Batcho - $1,500,000

Lou Malone - $1,000,000

1. Special damages that include lost wages, lost potential wages, and medical costs.

2. Award compensatory damages in an amount to be determined at trial;

3. Award punitive damages in an amount to be determined at trial;

4. Awarding costs and attorneys' fees,

5. Grant such other and further relief as the Court deems just and proper.

Jury Demand

The plaintiff demands a trial by jury on all triable issues.

Signature

Timothy Eckert, Pro-Se

138 East Ave, Suite 875

Lockport, NY 14095

**EXHIBIT A**